**Dawann DIXON, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**No. 393, 2009.**

Supreme Court of Delaware.

Submitted: March 31, 2010.

Decided: May 20, 2010.

---

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

James T. Wakley, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice:

In May 2008, the defendant-appellant, Dawann Dixon ("Dixon") was charged by indictment with Assault in the First Degree, Reckless Endangering in the First Degree, Possession of a Firearm During the Commission of a Felony, and Possession of a Deadly Weapon by a Person Prohibited. After a three-day jury trial, Dixon was convicted of all charges, except for Reckless Endangering in the First Degree, which was dismissed by the Superior Court upon motion by Dixon. Dixon was subsequently sentenced to thirty-eight years of imprisonment, suspended after ten years for a period of probation.

In this appeal, Dixon argues that the trial judge erred by permitting the State to present, as evidence, the recording of a conversation between a 911 operator and Tosha Hacket ("Hacket"). Dixon argues that the trial judge erred in concluding that Hacket's statements to the 911 operator were admissible as "excited utterances" under Delaware Uniform Rule of Evidence ("D.R.E.") 802(2). Dixon also argues that the admission of the recording violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

We have concluded that both of Dixon's arguments are without merit. Therefore, the judgments of the Superior Court are affirmed.

### Facts

In the early morning hours of March 28, 2008, Kevin Butcher ("Butcher") returned home from work. Shortly after arriving home, Butcher decided to go to the intersection of 24th and Lamotte Streets in Wilmington to speak with friends. At approximately 2 a.m., Butcher saw Dixon in the area. A few moments later, Butcher was shot in the leg.

Instead of going immediately to the hospital, Butcher went home. After awakening his mother, Butcher went with her to the front of the house. Butcher waved down a passing police cruiser, told the officer that he had been shot, and was transported to Wilmington Hospital. Butcher was treated for his injuries and was ultimately released, though the bullet remained lodged in his leg.

Three hours after he arrived at the hospital, Butcher was interviewed by Detective Matthew Hall ("Detective Hall") of the Wilmington Police Department. Detective Hall showed Butcher a six photo line-up containing Dixon's photo. Butcher looked at the photo array for approximately ten seconds and identified Dixon as the man who shot him. Butcher also told Detective

Hall "a more pinpoint area" to look for the crime scene. When Detective Hall and his partner went to the 100–block of East 23rd Street, they recovered three spent .25–caliber shell casings.

On April 6, 2008, Wilmington police received a report of a male banging on the front door of a house and refusing to leave. Officer Joseph Bucksner ("Officer Bucksner") was dispatched to the home, where he found Dixon standing at the front door of the home. Officer Bucksner ordered Dixon to sit down on the front steps and remove his hand from his pocket. Dixon refused. Officer Bucksner then grabbed Dixon by the arm, forced him to the ground and, with the help of his partner, handcuffed him. During a pat-down search of Dixon, Officer Bucksner found a loaded .25–caliber handgun and a Crown Royal bag containing .25–caliber ammunition. The gun seized from Dixon was ultimately determined to match the shell casings recovered from the scene of the crime.

### *911 Call*

Shortly after the shooting, a 911 dispatcher received a call from an individual who hung up almost immediately after the dispatcher came on the line. In accordance with police department policy, the dispatcher attempted to return the call. After two unsuccessful attempts, the dispatcher was able to reach the caller, a woman later identified as Hacket. The following is the exchange between Hacket and the 911 dispatcher:

DISPATCHER: 911, what is your emergency?

911 CALLER: (Inaudible.)

DISPATCHER: Hello. Hello.

911 CALLER: (Inaudible.) Fucking (Inaudible.)

DISPATCHER: Hello.

911 CALLER: I'm ready to call the mother fucking cops.

(New call, dispatcher calling 911 caller)

(New call, dispatcher calling 911 caller)

(New call, dispatcher calling 911 caller)

911 CALLER: Hello.

DISPATCHER: Hello. This is the Wilmington Police. We just received a 911 hangup from this number.

911 CALLER: Yeah, that's right. This is what you want to do. That's a 911 hangup. And go to 24th and Carter. And—

DISPATCHER: What's the problem there?

911 CALLER: It's a problem—a Black male just made a shot. And he has a goatee, looking like—his name is Dawann. He looks like—he looks like the dog called Peetie, whatever the dog—remember the pizza thing? He just shot while I was standing there. And I'm not a snitch and I'm not testifying or nothing. I don't care how you guys check the phone back. I'm just telling you, I'm running from him.

DISPATCHER: He shot someone?

911 CALLER: He didn't shoot anybody. He shot at them. So, get his fucking gunfire off his ass because he's not— he's not Caucasian, so I hope you guys get here. It's not Greenville, it's not Claymont. Okay? and—nor is it Hockessin. So I hope you get here fast enough just to know he still has the powder on his hands. If I was a CSI detective, I would have it off his hands by now. Okay?

He has a goatee, and it's really big. It looks like a Sunni, like he's trying to act like he's into (inaudible) to Allah, a Creator. But if he was into the Creator so much, he wouldn't be shooting at people. And when he—

DISPATCHER: What's he wearing?

911 CALLED: All black.

Mother fucker. He going to get it now. Bitch. Excuse me my language because I'm so upset.

DISPATCHER: How many shots did he shoot off?

911 CALLER: One, two, three, blah-blah-blah. Bitch. While I was standing there. And, thank God. I'm not—

DISPATCHER: What's your name, ma'am?

911 CALLER: I'm not telling you all that. Please don't—

DISPATCHER: Not a problem.

911 CALLER: Guess what? You just have them come to 23rd and Carter and look for a guy. And, then, guess what else he has in his goatee. His goatee is very full. It's full like he's looking at a Muslim guy. And, then, it has gray in it, a stick of gray. And he looks like—and if you take off his hat, he looks the daggone dog from you know, the (inaudible) Taco Bell, the Taco Bell dog. He's very light.

DISPATCHER: And is he tall or short?

911 CALLER: No, he's, like, a medium height. Bastard. And I—

DISPATCHER: What about weight?

911 CALLER: I don't know his weight. He's thin.

DISPATCHER: He's thin?

911 CALLER: Yeah.

Bastard. Why would he do that? You try and get information from the phone, I still ain't testifying. I don't care whatever you do. Because I live here. Okay? I already called you about this. I'm very upset. I'm outside this time of night because my sister just got beat up. But at the same time, I can stand here and be talking whatever time of the night it

is. I do work. For him to do that, it pisses me off.

DISPATCHER: All right. I'll go ahead and get the information and assist and we'll get an—

911 CALLER: You—

DISPATCHER:—officer out there. If you—if anything changes, give us a call back. Okay?

911 CALLER: No, I'm not, if anything changes because, in the name of Jesus, it won't change. He—you got the information and you get his ass, because his name is Dawann. He's been shot before. You get his ass. Because I'll make sure, if I see him again, I'll call you back. I'm not playing with him.

(Inaudible cross talk.)

911 CALLER: He shot three shots in front of me. Ma'am, I'm standing here to tell you this.

DISPATCHER: I understand. What's his last name again?

911 CALLER: Excuse me?

DISPATCHER: What was the last name? Dawann what?

911 CALLER: On, no. Oh, no. Thank you.

DISPATCHER: All right, thank you.

### Hacket's Statements Were "Excited Utterances"

■ The State sought to introduce Hacket's 911 call into evidence. Dixon objected and argued that the 911 call was inadmissible hearsay because Hacket failed to appear at trial. The Superior Court held that the content of the 911 call was admissible under the "excited utterance" exception to the hearsay rule.

Generally, hearsay statements are not admissible at trial.[1] There are, however, certain exceptions to that general rule.[2] These exceptions are defined by circumstances that are deemed to provide an indicia of trustworthiness to the statement. One exception is an "excited utterance," which is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[3] There are three foundational requirements that must be satisfied before a statement can be admitted pursuant to the excited utterance exception in Rule 803(2):

> (1) the excitement of the declarant must have been precipitated by an event; (2) the statement being offered as evidence must have been made during the time period while the excitement of the event was continuing; and (3) the statement must be related to the startling event.[4]

According to Dixon, Hacket's statements to the 911 operator were not "excited utterances" because too much time had elapsed between the shooting and her call and Hacket was no longer under the "stress of excitement."

For admission as a present sense impression under D.R.E. 803(1) a *sine qua non* is for the hearsay statement to be made either immediately or in very close temporal proximity to the precipitating event.[5] For admission as an excited utterance under D.R.E. 803(2), however, "[w]hile the amount of time that has elapsed from the occurrence of the event or condition is a factor to consider in the analysis, it is not solely determinative."[6] In *Culp v. State*,[7] the Superior Court denied a defense request to play recordings of 911 calls made by the defendant because "too much time [had] elapsed between the time of the event and the making of the statements to satisfy the excited utterance exception to the hearsay rule."[8] This Court reversed, holding that, to be admissible under Rule 803(2), the declarant must simply be "under the 'stress of excitement' caused by the startling event or condition at the time of the statement's making."[9]

In *Warren v. State*,[10] this Court held that a 911 call to describe events that occurred over one hour before the call was admissible under the excited utterance exception to the hearsay rule in D.R.E. 803(2). In this case, Hacket's call to the 911 dispatcher was made shortly after the shooting. Butcher testified that the shooting took place at 2 a.m. The 911 dispatcher received the first call from Hacket just prior to 2:15 a.m.

The trial judge found that Hacket was still under the stress of excitement at the time of the 911 call. After listening to the 911 call, the trial judge stated that the caller "sounds excited, she describes herself as being upset." The trial judge also

---

1. D.R.E. 802.

2. *See* D.R.E. 803(1)-(25); D.R.E. 804.

3. D.R.E. 803(2).

4. *Gannon v. State*, 704 A.2d 272, 274 (Del. 1998) (citing 6 Wigmore, *Evidence* § 1750 (Chadbourn rev. 1976)).

5. Courts generally find statements admissible as a present sense exception to the hearsay rule, under D.R.E. 803(1), if the statements are made either immediately or within about ten or twenty minutes of the event. *Warren v. State*, 774 A.2d 246, 253 (Del.2001).

6. *Culp v. State*, 766 A.2d 486, 490 (Del.2001) (citations omitted).

7. *Culp v. State*, 766 A.2d 486 (Del.2001).

8. *Id.* at 490.

9. *Id.*

10. *Warren v. State*, 774 A.2d at 253.

noted that the caller was out of breath, was moving and claimed to be running away from the shooter. The trial judge concluded that Hacket's statements were "almost a classic excited utterance."

The record reflects that Hacket's statements to the 911 dispatcher satisfied all three of the foundational requirements to qualify as an excited utterance under D.R.E. 803(2). Hacket's statements to the 911 operator were precipitated by the shooting, were made as she was running from Dixon, and were made while she was still under the stress of excitement caused by the event. Accordingly, we hold that Hacket's statements were admissible as excited utterances under D.R.E. 803(2).

### Confrontation Clause

█ Our conclusion that Hacket's 911 call was properly admitted into evidence under the excited utterance exception to the hearsay rule does not end the analysis. We must also decide whether the admission of Hacket's 911 call comported with the requirements of the Sixth Amendment's Confrontation Clause. In undertaking that analysis, the Superior Court properly relied upon the United States Supreme Court's holding in *Davis v. Washington*.[11]

In deciding *Davis*, the United States Supreme Court was required to determine when statements made to law enforcement personnel during a 911 call are "testimonial" and, therefore, subject to the admissibility requirements of the Confrontation Clause in the Sixth Amendment. The facts in *Davis* are very similar to those that are presented in Dixon's case. In

both matters, when the 911 operator answered the initial call, the connection terminated before anyone spoke. When each of the operators called back by reversing the calls, the conversations at issue occurred. In both cases, the caller identified the perpetrator of an alleged crime. In both cases, neither caller appeared at the defendant's trial and, over defense objections, the trial judge admitted the recordings of each caller's statements to the 911 operators.

In *Davis*, the United States Supreme Court explained and applied its holding in *Crawford v. Washington*.[12] The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[13] In *Crawford*, the Supreme Court held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[14] The issue presented in *Davis* required the Supreme Court to define the parameters of *Crawford's* use of the phrase "testimonial statements."

In *Davis*, the Supreme Court framed the questions before it as "whether the Confrontation Clause applies only to testimonial hearsay; and, if so, whether the recording of a 911 call qualifies."[15] The Supreme Court concluded that an affirmative answer to the first question was suggested by the following language in *Crawford:*

---

11. *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

12. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

13. U.S. Const. amend. VI.

14. *Crawford v. Washington*, 541 U.S. at 53–54, 124 S.Ct. 1354.

15. *Davis v. Washington*, 547 U.S. at 823, 126 S.Ct. 2266.

The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to "witnesses" against the accused-in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.[16]

The second question to be answered in *Davis* was whether, "objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements."[17] The Supreme Court noted that the *Crawford* testimonial hearsay included statements during interrogations by law enforcement officers "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator."[18] In *Davis*, the Supreme Court distinguished "[a] 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, [as] ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."[19]

■■■ Only " 'testimonial statements' cause a declarant to be a witness" subject to the structures of the Confrontation Clause.[20] According to the Supreme Court, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."[21] Although in *Crawford*, the Supreme Court set forth "[v]arious formulations of th[e] core class of 'testimonial' statements,"[22] *Davis* required it to make a more precise determination of which police interrogations produce testimony, as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[23]

The differences that the Supreme Court found between the interrogation in *Davis* and one in *Crawford* are exactly the same differences that are extant in Dixon's case. First, the 911 callers were both speaking about events that were actually happening. Second, each 911 caller was asking for help against a bona fide physical threat. Third, the nature of the dispatcher's exchange with both 911 calls was necessary to resolve a present emergency and not, as in *Crawford*, to learn what had happened in the past. In *Davis*, the Supreme Court noted that was true "even of the operator's

16. *Davis v. Washington*, 547 U.S. at 823–24, 126 S.Ct. 2266 (quoting *Crawford v. Washington*, 541 U.S. at 51, 124 S.Ct. 1354).

17. *Davis v. Washington*, 547 U.S. at 826, 126 S.Ct. 2266.

18. *Id.*

19. *Id.* at 827, 126 S.Ct. 2266.

20. *Id.* at 814, 126 S.Ct. 2266.

21. *Id.* at 821, 126 S.Ct. 2266.

22. *Crawford v. Washington*, 541 U.S. at 51, 124 S.Ct. 1354.

23. *Davis v. Washington*, 547 U.S. at 822, 126 S.Ct. 2266.

effort to establish the identity of the assailant." [24]  Finally, in *Davis* and in Dixon's case, both of the 911 callers were speaking in an unsafe setting.

In *Davis*, the Supreme Court concluded that the circumstances of the 911 caller's interrogation "objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency. [The 911 caller] simply was not acting as a *witness*; she was not *testifying*. What she said was not 'a weaker substitute for live testimony' at trial." [25]  In *Davis*, the Supreme Court held that the 911 caller's statements identifying the defendant were not testimonial.

We reach the same conclusion in Dixon's case with regard to Hacket's statements to the 911 dispatcher that described and identified Dixon for the purpose of having him apprehended by the police.  Similarly, we also hold that even if some portions of statements in the 911 call were testimonial, their admission into evidence before Dixon's jury was harmless beyond a reasonable doubt, [26] given the statement by the victim, pursuant to title 11, section 3507 of the Delaware Code, [27] that identified Dixon as his assailant, and the matching bullets that were recovered when Dixon was arrested.  Therefore, we hold that the admission of Hacket's 911 call into evidence did not violate Dixon's rights under the Sixth Amendment's Confrontation Clause.

### Conclusion

The judgments of the Superior Court are affirmed.

---

24.  *Id.* at 827, 126 S.Ct. 2266.

25.  *Id.* at 828, 126 S.Ct. 2266 (quoting *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)).

26.  *Id.* at 829, 126 S.Ct. 2266.

27.  Del.Code ann. tit. 11, § 3507 (2007).