# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE                  )
                                   )
          V.                       )          DEF. I.D.: 1512002451
                                   )
VINCENT CLARK,                     )
                                   )
          Defendant.               )


Submitted:  December 22, 2016
Decided:  February 13, 2017


## MEMORANDUM OPINION

*Upon Consideration of the State's Motion
to Admit Out of Court Statements*
**GRANTED in Part and DENIED in Part**


Brian J. Robertson, Esquire and Christina M. Kontis, Esquire, Department of Justice, Wilmington, Delaware.  Attorneys for the State of Delaware.

Dade D. Werb, Esquire and David C. Skoranski, Esquire, Office of Defense Services, Wilmington, Delaware.  Attorneys for the Defendant.


**BUTLER, J.**

## STATEMENT OF THE CASE

The facts necessary to understand the issues in this case take us through the parking lot of a north Wilmington apartment complex, through a police station and eventually to the tragic death of the State's star witness, who is now unavailable to tell the story of what happened. Her death has caused an evidentiary quagmire that the State has asked the Court to rule on pretrial. The Court will do so by first discussing the story of the case, as understood through the lens of the deceased witness' statements.

Molly Hoffman was a nearby Pennsylvania resident whose life put her in contact with drug addiction and its attendant personalities. By December, 2015, she had prior convictions for shoplifting and was actively on probation in Pennsylvania from a drug conviction. She had been to rehab, had been on home confinement, yet continued to battle her demons. She was living in the basement of her sister's house, trying to stay clean; her success cannot be claimed with any certainty.

On December 3, 2015, Ms. Hoffman asked her sister Michelle to drop Molly off at the family doctor's office for a routine visit, assuring her sister that she would get a ride home from someone else. Michelle was acutely aware of Molly's drug use but believed Molly was capable of getting a ride. Once Michelle left Molly, Molly proceeded to her doctor's appointment and contacted "Martin" (not

1

otherwise specified) who lived in the Brandywine Apartments in North Wilmington, a short drive away from the doctor's office. Martin invited Molly to visit and asked Molly to obtain illegal drugs (cocaine) for him to ingest when she arrived. Molly agreed to Martin's request.

Molly knew at least two individuals who could satisfy Martin's request: Jamai White and Vincent Clark. Molly called Jamai White to request $60 in crack, but the battery on White's phone apparently died mid-order and she was unable to be certain the arrangement had been solidified. After waiting a while near the doctor's office to see if White got the message clearly, she tried Vincent Clark. Clark responded affirmatively and offered to pick up Molly and bring her to Brandywine Apartments.

According to Molly, Vincent Clark and a female picked her up in Clark's car and drove her to Brandywine Apartments. Along the way, they engaged in casual conversation. At one point Clark asked Molly if she had seen Jamai White, who had recently been in custody. Molly told Clark she had heard that White was out of jail, and Vincent Clark asked Molly to reach out to Jamai White and ask him to bring the $60 in cocaine to the Brandywine Apartments.

We pause briefly here to note the obvious: Molly already had $60 in cocaine that she was procuring from Vincent Clark. She had no more money and did not want another $60 in cocaine from Jamai White. According to Molly's subsequent

2

statements, she knew Clark and White were acquainted and assumed (incorrectly) that Clark simply wanted to see White to say hello. She did not question why Clark wanted her to order drugs from White, an odd request indeed given Clark's status as a drug dealer himself. She accepted uncritically why Clark wanted her to engage in this ruse with White, and obliged Clark anyway.

It was a fateful error. When Molly and Vincent Clark got to the Brandywine Apartments, she still had not heard back from Jamai White with his dead phone battery. Clark left, asking Molly to get in touch with him if and when Jamai White contacted her. Martin came out of his apartment, paid Clark for the cocaine and Martin and Molly proceeded into Martin's apartment.

Just a few minutes later, Jamai White phoned Molly and, as requested, she asked White if he could still deliver the $60 worth of cocaine they had previously discussed to her at the Brandywine Apartments. White agreed. Molly immediately called Clark, who told her he was still in the parking lot and Clark would see White when he arrived.

When White arrived at the apartment complex, he pulled up in a pickup truck that Molly did not immediately recognize. She approached the truck to confirm it was indeed White, at which point she realized Clark was approaching the truck on foot. Clark fired multiple shots into the truck, hitting White and causing his demise.

3

Exactly where Molly was as the shots were fired is not entirely clear, despite numerous statements recounting the event. What is certain, however, is that she was very quickly back in Martin's apartment. Clark had left for points unknown. Within minutes of returning to the apartment, she got a phone call from Clark threatening her life if she reported anything she had seen and directing her to get rid of her phone. Molly quickly removed the SIM card from the phone and flushed it down the toilet. She then put the phone between the cushions in Martin's apartment.

Police swarmed the area and knocked on Martin's door. She and Martin avowed they knew nothing about what had happened in the parking lot, but it was all a bit much for Molly. She walked away from the complex and, borrowing a friend's phone, she called her sister Michelle for a ride out of the area. Michelle arrived shortly and quickly realized that Molly had been through an ordeal. Molly gave Michelle a somewhat truncated version of what had happened, at which point Michelle told Molly it was essential that she return to the scene and tell the police what she knew.

Michelle and Molly flagged down one of the swarming County police officers. The officer drove her to the police station and while doing so, switched on an audio recorder. Thus, Molly gave her first recorded statement concerning what had just happened. It is beyond question that her mental state was one of

4

extreme agitation and her statement was disjointed, punctuated by frequent bursts of "Oh my God."

The County officer brought Molly to the police station where she gave her second audio recorded statement to a detective. By then, and over the course of the statement, she calmed down to the point that she was able to convey a fairly consistent, coherent – if not entirely logical – version of what happened.

After her interviews in December 2015, Molly Hoffman was sent home while the investigation continued. It is unknown whether and when Ms. Hoffman relapsed into her drug addiction. What is known is that on August 16, 2016, Molly died of a fatal dose of chemicals. We are told she succumbed to an opioid analgesic called U-47700, which has a street name of "Pink," a drug with 7.5 times the potency of heroin.

After Molly Hoffman's death, the police called her sister Michelle into the police station to give a recorded statement concerning her conversation with Molly in those moments after she picked up Molly on December 3, 2015 and before she contacted the police a short time later. This statement can thus be called "Statement 1" because Molly made it closest to the event, or "Statement 3" because it is the last one procured by the police.

The State correctly surmises that Molly's death casts the admissibility of any of her prior statements in doubt and has sought a ruling from the Court.

Arguments are pressed for the admissibility of all three, and they coalesce around common themes: D.R.E. 803(1) (present sense impression) D.R.E. 803(2) (excited utterance) and D.R.E. 807 (the residual exception). But the "elephant in the room" as to all of them is *Crawford v. Washington*[1] and the Supreme Court's jurisprudence on the Confrontation Clause. For if a statement violates the Confrontation Clause, it matters not that it may "fit" within a hearsay exception.

## ANALYSIS

### 1. THE CONFRONTATION CLAUSE

This Court had occasion to consider the Confrontation Clause and the U.S Supreme Court's decision in *Crawford v. Washington* last year in our decision in *State v. Benson.*[2] In that case, we were ruling on the admissibility of an autopsy report prepared by a pathologist no longer available for trial. But we would do well to recall the specific facts in *Crawford*.

Michael Crawford was arrested for stabbing Kenneth Lee. Michael and his wife Sylvia were both brought to the police station and each gave statements that generally coincided with the proposition that the stabbing occurred during a fight over an allegation that Kenneth Lee had tried to rape Sylvia. By the time of trial, Sylvia was "unavailable," relying upon the state's marital privilege law to decline

---

[1] 541 U.S. 36 (2004).

[2] 2015 WL 3539995, at *3 (Del. Super. June 2, 2015).

6

to give testimony against her husband. The state was permitted to play her previously recorded statement, despite Michael's hearsay objections.

The Supreme Court announced a completely new formulation of Confrontation Clause analysis. Justice Scalia, examining English common law from the 17th Century, noted that the Constitution's framers were particularly concerned with trials predicated on affidavits and unsworn, out of court declarations gathered by the government and not subject to cross examination. *Ohio v. Roberts*,[3] which set the standard for Confrontation Clause admissibility from 1980 until Crawford was decided in 2004, had always relied upon those "indicia of reliability" of an out of court statement that would give the statement "particular guarantees of trustworthiness" to overcome a Confrontation Clause objection. Justice Scalia, in effectively overturning *Roberts*, pointed out that, for example, in *Crawford's* case itself, "reliability" had been 1) found in the trial court, 2) not found in the Court of Appeals, and 3) found again in the Washington Supreme Court. In repudiating *Roberts*, the Court said, "The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one."[4] The "constitutionally

---

[3] 448 U.S. 56 (1980).

[4] *Crawford*, 541 U.S. at 62.

7

prescribed method" to which he was referring was, of course, confrontation and cross examination. As Justice Scalia put it, "The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined."[5]

Another significant Confrontation Clause opinion from the U.S. Supreme Court bearing upon our analysis here is *Davis v. Washington.*[6] *Davis* called for the application of the principles laid down in *Crawford* in two specific contexts. In *Davis,* a domestic violence victim was on the phone with a 911 call taker, describing an attack as it was ongoing. In a companion case decided with it, *Hammon v. Indiana,*[7] a domestic violence victim gave a statement to the police in her home when they arrived to investigate a report of domestic violence. While originally telling police everything was fine, when separated from her husband at the home, she gave statements used against him at trial. In both cases, the complaining witness did not testify and the defendants were convicted based upon 1) the 911 tape and 2) a police officer's account of her statement to them respectively.

---

[5] *Id.* at 61.

[6] 547 U.S. 813 (2006).

[7] *Id.*

The Supreme Court found the 911 call tape "nontestimonial" and the report of the interview with Hammon "testimonial." As such, one conviction was affirmed and the other wasn't. In distinguishing the two cases, the Court attempted to flesh out its definition of "testimonial" hearsay:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[8]

Since the term "primary purpose" was used consecutively in two sentences describing the difference between the two types of testimony, this has come to be called the "primary purpose" test. The primary purpose of the 911 call was to seek police assistance and the primary purpose of much of the questioning was to ascertain the presence of the suspect and whether he was armed and dangerous. Notably, the Court held that only those portions of the 911 call related to the ongoing emergency were not testimonial and should be admitted and the defense should seek redaction of those portions that were testimonial.[9]

In *Hammon*, the Court felt it had no difficulty ruling the statements testimonial, as it was merely a logical extension of its *Crawford* holding. Even

---

[8] *Id.* at 822.

[9] *Id.* at 829.

though her husband was still on the scene at the residence, the Court found that there was no emergency in progress, no immediate threat of harm to the complainant, and police asked questions "primarily" to determine "what happened" as opposed to "what is happening?" *Crawford* was thus virtually indistinguishable from *Hammon*:

> Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.[10]

A case demonstrating just how messy determinations of what is "testimonial" can get is *Michigan v. Bryant*,[11] a case arising 7 years after *Crawford* upset the Confrontation Clause apple cart. In *Bryant*, a shooting victim was found in a parking lot and told the police he had been shot by Bryant, at Bryant's house, before succumbing to his wounds. His "excited utterance" was reiterated by a police officer at Bryant's trial and Bryant was convicted.

In ruling on the case, the Supreme Court had to dig further into the question of what an "ongoing emergency" is. While the 911 call in *Davis* recited an active, ongoing assault, in *Bryant*, the shooter was not on the scene, the victim had obviously been shot, and had removed himself to the parking lot. Nonetheless, the

---

[10] *Id.* at 830.

[11] 562 U.S. 344 (2011).

Court held that the victim's statement to the police was not testimonial. According to the Court, the "primary purpose" test requires an objective determination whether the purpose of the interrogation of the declarant was to enable police assistance to deal with an ongoing emergency.[12]

In what we will call a "vigorous" dissent, Justice Scalia was wont to recall that the statement by the shooting victim concerned a past event and there was no evidence of any ongoing emergency and therefore, in his view, the majority opinion was a major expansion of the limited permissible hearsay wrought by his decisions in *Davis* and *Crawford* and indeed, inconsistent with the ruling in *Hammon v. Indiana.*

The Delaware Supreme Court has weighed in on *Crawford* in the context of documentary proof admitted without an opportunity to cross examine, but that issue takes us down a somewhat different path.[13] In *Dixon v. State,* we have the Court affirming the admissibility of a 911 call in the context of a *Crawford* objection.[14] This is helpful, but adequately explained by *Davis v. Washington.* So

---

[12] *Id.* at 378.

[13] *See Milligan v. State,* 116 A.3d 1232, 1242 (Del. 2015) (Confrontation Clause did not require State to present live testimony of each person who exercised custody or control over defendant's blood sample, for purposes of establishing chain of custody, in trial for DUI); *see also Martin v. State,* 60 A.3d 1100, 1108 (Del. 2013) (admission of blood analysis report prepared and certified by laboratory manager who did not perform or observe chemist's testing of defendant's blood sample, which report certified that defendant's blood tested positive for phencyclidine (PCP), violated defendant's right of confrontation, in trial for driving while under influence or with prohibited drug content).

[14] 996 A.2d 1271 (2010).

11

these essential decisional tools must suffice for our analysis of the three subject statements in light of *Crawford*.

## 2. MOLLY'S INTERVIEW WITH DETECTIVES AT THE POLICE STATION IS "TESTIMONIAL."

Of the three statements at issue here, the one that most clearly meets the *Crawford* "definition" of a "testimonial" statement is the one given by Molly Hoffman to Detective Reid at the County Police Headquarters, hours after the events at the apartment complex. The "primary purpose" of the statement was to memorialize Molly's best recollection of what occurred and who did it. Were it played into evidence against the defendant with no opportunity to cross examine Molly, it has all of the hallmarks of the evils Justice Scalia conjured in *Crawford* and *Davis*.

Indeed, while the State argues in its brief that the statement should be admitted through the residual hearsay exception, because of its circumstantial guarantees of trustworthiness, even the State makes no argument that this statement satisfies the "testimonial" hearsay bar under *Crawford*. The State can be forgiven the failure to do so, because there is simply no more to say. The statement is testimonial and cannot be admitted.

12

### 3. MOLLY'S STATEMENT TO HER SISTER, BEFORE FLAGGING DOWN THE POLICE, IS NOT "TESTIMONIAL."

Just as surely as Molly's statement to detectives at the station is testimonial, her statement to Michelle is not. The "primary purpose" for making the statement was essentially to download to her sister the flood of emotions she was feeling immediately after witnessing a shocking event. Neither she nor her sister would have had any inkling that it was important to utter a word with an eye to the niceties of forensic evidence or criminal prosecution. Neither was employed by, associated with, or even interested in seeing, anyone connected with law enforcement. This was not a "testimonial" statement.

### 4. MOLLY'S STATEMENT TO THE PATROL OFFICER, RECORDED BY THE OFFICER IN THE BACK SEAT OF THE PATROL CAR ON THE WAY TO THE STATION, IS "TESTIMONIAL."

Of the three statements, the one sitting astride the two "clearly" opposed extremes is the one she made to Officer Herrera. According to the papers, Officer Herrera was the one that was flagged down by Molly and Michelle when they conferred and concluded this was the appropriate course of action. The shooting was quite over, the perpetrator had quite clearly fled the scene. Thus, any argument that the statement "fits" into the "ongoing emergency" rubric of *Davis* is strained at best.

13

Taking our direction from *Michigan v. Bryant*, with which this case shares some similarities, we consider the "primary purpose" of the statement. It is intriguing here, because in *Bryant*, the "primary purpose" in the statement maker's making the statement was to get assistance for his gunshot wound, while the Court ruled that the "primary purpose" in the statement recipient's asking the questions – the police – was to determine the immediacy of a present threat and the location of any weapons. Indeed, Justice Sotomoyor made specific reference to the gun question in distinguishing the "primary purpose" of the questioning in *Bryant* from the questioning in the domestic battery cases of *Davis* and *Hammon* that did not involve a weapon.

Here, it must be conceded that turning on a tape recorder in a squad car while driving a witness/suspect to the police station was an inspired decision by an alert patrol officer. Doing so preserved an important, detailed statement by a direct eyewitness (and at that point, surely a potential suspect) in a murder that had occurred within the past hour.

But unlike *Bryant*, Molly was not a gunshot victim in need of immediate assistance. And the questions directed to her over what happened were virtually all in the past tense – seeking to understand who the various actors were and how they related to each other. After hearing the whole statement, it is difficult to call the

14

statement anything but one whose "primary purpose" was the historical preservation of the testimony of Molly Hoffman.

The State asks the Court to consider the Delaware case of *Urquhart v. State*,[15] to which we now turn.

*Urquhart* was a case in which a police officer, responding to a robbery at a street corner store, approached a woman in the adjacent block who told the officer that she had seen someone flee the area, driving a particular car with a particular license plate number. The woman did not appear at trial and the State was permitted to introduce her statement as an "excited utterance." As to defendant's *Crawford* objection, the Supreme Court affirmed the trial court's conclusion that "the witness answered the officer voluntarily and did so to assist him in an ongoing emergency 'rather than simply to learn what happened in the past.'"[16]

Of course, we recognize this "ongoing emergency" issue from its discussion in the Supreme Court's *Michigan v. Bryant* case. And this forces the Court to consider the theoretical shortcomings of the majority opinion on *Bryant*, as so eloquently pointed out by Justice Scalia in his dissent. In *Bryant*, the victim was located in a parking lot, having driven himself there after being shot at another location. While the majority found an "ongoing emergency" in the fact that an armed gunman remained on the loose, the same may be said of any shooting until

---

[15] 2016 WL 768268 (Del. Feb. 26, 2016).

[16] *Id.* at *3 (quoting *Davis*, 547 U.S. at 822).

15

the said gunman is captured. It strains credulity to conclude that the victim or police in *Bryant* were under a current, ongoing, life threatening emergency when police elicited statements from the shooting victim. It must be concluded that Bryant marks a decided expansion of the scope of the ongoing emergency "exception" recognized by the Court in *Davis v. Washington.* But even as expanded, the statements were made by a witness/victim while still on the scene – or at least a scene – being administered first aid, not in the ambulance or at the hospital.

Obviously, it is not for a trial court to pronounce a rule that statements made at the crime scene when police first arrive and before the suspect is apprehended will always qualify as "ongoing emergency/nontestimonial" statements. But it does seem that once the non-testifying witness has been removed from the crime scene and is safely in a squad car on the way to the police station, it is simply incorrect to conclude that an "emergency" within the meaning of *Davis,* or *Bryant,* or *Urquhart,* still exists. Thus, while *Urquhart* and *Bryant* both authorize the admissibility of statements to police made at the crime scene shortly after their arrival, neither sanction the statement here, made in a squad car on the way to the station.

Having concluded that the only one of the three statements that "pass" through the gauntlet of admissibility under post-*Crawford* Confrontation Clause

analysis, we will examine that remaining statement for admissibility under the Delaware Rules of Evidence.

### 5. MOLLY'S STATEMENT TO HER SISTER SATISFIES THE EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE.

We proceed on the assumption that the State will produce Michelle Hoffman who will testify to the statements made by Molly to her in the few minutes from when she picked up Molly in the parking lot until when they flagged down a patrol officer and were separated.

Delaware Rule of Evidence Rule 803(2) provides that hearsay statements are inadmissible except "a statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition."

In order to establish admissibility as an excited utterance, the following elements must be shown: "(1) the excitement of the declarant must have been precipitated by an event; (2) the statement being offered as evidence must have been made during the time period while the excitement of the event was continuing; and (3) the statement must be related to the startling event."[17] There is

---

[17] *Gannon v. State*, 704 A.2d 272, 274 (Del. 1998).

no particular "contemporaneity" requirement, so long as the declarant remains influenced by the excitement caused by the precipitating event.[18]

Here, the Court has little difficulty concluding that Molly's statement made to her sister Michelle within minutes of being picked up were made "while the declarant was under the stress or excitement caused by the event or condition." While the Court cannot admit her recorded statement to Officer Herrera made a few minutes afterward in the patrol car, her voice is recorded and its mood and manner of speech at that point can only be described as distraught. That is consistent with Michelle's description of her sister's condition when she met her in the parking lot. Michelle acknowledged that while she has seen her sister under the influence of drugs before, Molly's behavior on the night in question was clearly not the behavior of her sister when she is high, but rather behavior she had never seen in her before. She was crying, panicked and scared, to the point that she noticed Molly's face was paler than her usual complexion.

While the defense takes the State to task regarding whether her later statements are "excited utterances" or "present sense impressions," it does little to attack the question whether Molly's statement to her sister meets the definition.

---

[18] *See e.g. Evans v. State*, 2004 WL 1790191, at *2 (Del. 2004) (holding that two out-of-court statements were properly admitted under the excited utterance exception even though the statements were made four hours and nine hours after the shooting because the declarant was still under the stress of excitement caused by that event); *Dixon v. State*, 996 A.2d 1271, 1276 (Del. 2010) (holding that 911 call made fifteen minutes after a shooting was made under the stress of excitement and was properly admitted under excited utterance exception); *Warren v. State*, 774 A.2d 246, 253 (Del. 2001) (holding that 911 call to describe events that occurred over one hour before call was admissible under excited utterance exception to hearsay rule).

18

Because the Court here rules that her other statements are inadmissible under *Crawford*, the defense's arguments concerning the Delaware Rules of Evidence as to those statements are largely irrelevant. Her statement to her sister clearly satisfies Rule 803(2) as an "excited utterance" and may be admitted.

## CONCLUSION

For the foregoing reasons, the State's Motion to Admit Out of Court Statements is GRANTED in Part and DENIED in Part.

**IT IS SO ORDERED**.

Judge Charles E. Butler