# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
)
)
v. ) ID. No. 2302006594
)
DOUGLAS DEANGELIS, )
)
)
Defendant. )

Submitted: February 12, 2024
Decided: April 5, 2024

## MEMORANDUM OPINION

*Upon Consideration of State's Motion in Limine for Admission
of Hearsay Statements,*
**GRANTED.**

Diana A. Dunn, Attorney General. Attorney for the State of Delaware.

Sean Motoyoshi, Esquire, Office of the Public Defender. Attorney for the Defendant.

**BUTLER, R.J.**

This is the Court's ruling on the State's motion *in limine* concerning the admissibility of statements made by the complaining witness, an elderly woman suffering from dementia to various witnesses.[1] The Defendant is her son, who was living in her house at the time of the acts complained of, which include assault and rape.[2] The complainant's dementia has progressed since the incident. She is now in a memory care facility and unable to testify to the events in question. Thus, the admissibility of her prior statements is an issue of significance in this matter.

## I.      Statements on December 29, 2022

### a.    Statements to the Neighbor

The Defendant lived with his 89-year-old mother.[3] At approximately 9:30 pm p.m. on December 29, 2022, mother appeared at the door of her next door neighbor and announced that her son, the Defendant, had beaten her.[4] She was visibly upset and appeared disheveled.[5] The neighbor called the police, who responded soon thereafter, as did an ambulance.[6]

---

[1] *See* State's Mot. in Limine.
[2] State's Mot. in Limine, pp. 1-4.
[3] Def.'s Response to State's Mot. in Limine, pp. 1-2.
[4] State's Mot. in Limine, pp. 1.
[5] *Id.*
[6] *Id.* at 1-2.

### b. Statements to the New Castle County Police

The interactions between mother and the police were captured on a body worn camera of a police officer.[7] She explained to the officer that her son had beaten her, and it had just occurred before she exited her residence next door via the back door.[8] She stated she was unsure if her son had witnessed her leave the residence but was reasonably sure he was still there.[9]

After speaking to mother, police went to her house, interviewed her son, and ultimately departed with no arrest being made.

### c. Statements to Paramedics at the Scene

Paramedics arrived and took a history.[10] Mother said that the Defendant had grabbed her arms and held her down on the floor.[11] They observed bruising on her arms and a laceration on her forearm.[12] Mother refused transportation to the hospital.

---

[7] *Id.* at 2.
[8] *Id.*
[9] *Id.*
[10] State's Mot. in Limine, p. 2.
[11] *Id.*
[12] *Id.*

## II. Statements on January 1, 2023

### a. Statements made to neighbor

At approximately 10:30 p.m. on January 1, 2023, the complainant again appeared at the door of her next door neighbor.[13] She was wearing only her pajamas and no shoes.[14] She appeared nervous and frazzled and told the neighbor "Doug raped me."[15] The neighbor called mother's granddaughter, who took mother to granddaughter's home. Later that evening, granddaughter called the police out of concern that her grandmother was accusing her of holding mother against her will. Another body worn camera depicts the police intervention, including mother's confused state of mind. From all of this, however, there are no statements that the State seeks to introduce.

## III. Statements on January 17, 2023

### a. Statements to the Neighbor

The elderly complainant appeared again at her next door neighbor's door at 8:30 a.m.[16] She had puffy, purpled eyes and appeared to have difficulty

---

[13] *Id.* at 3.
[14] *Id.*
[15] State's Mot. in Limine, p. 3.
[16] *Id.*

swallowing.[17]  She asked "what am I going to do about Doug?"[18]  Unsure what to do, the neighbor contacted her family members via text message to advise that she did not appear well.[19]  The Defendant appeared at the neighbor's house later that morning and transported the complainant to the Christiana Hospital.[20]  Hospital personnel noted significant bruising to the complainant's face, neck, arms, breast, chest, genitals and upper thighs.[21]  Broken ribs were discovered.[22]

### b.  Statements Made During Psychiatric Consultation

The complainant remained in the hospital for several days.[23]  During her stay, a Psychology Consultation was completed.[24]  It was apparently during this consultation that the Complainant made several statements that the State seeks to introduce.[25]  These consultation notes include the following concerning the Defendant:

"He gets angry when I ask too many questions."

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] State's Mot. in Limine, p. 3.
[22] *Id.*
[23] *Id.* at 4.
[24] *Id.*
[25] *Id.*

4

"He does have a problem with drinking, and when he's angry and drinking, I just try to stay away."

"He has been abusive to me in the past, not all the time though."

"He shoved me, hit me in the face, and put his hands around my neck. I don't know what I do to deserve it."

"Finally, pt reported hx of 'sexual attacks' by son. She detailed that 'he becomes really upset' when she 'says no.'"[26]

## ANALYSIS

### 1. THE UNAVAILABILTY OF THE WITNESS

The State has taken the position that in light of the fact that the complainant witness is now in a memory care facility, she is "unavailable" for the purposes of any hearsay analysis. The defense concedes that if she is unable, by reason of the advance of her dementia, to remember or relate testimony concerning the events in question, she should be considered unavailable. But without direct access to the complainant and forced to rely on the State's representations, the defense asks the Court to make a finding of her unavailability upon some basis other than the State's say so. The Court requested that the State provide such evidence of the

---

[26] Psych Consultation, Jan. 20, 2023, p. 45.

complainant's current condition as they believe would satisfy the Defendant's concerns.

The State has since submitted records of Rockland Place, which appears to be a memory care facility in which the complainant is now housed, to support its claim of the complainant's incompetence to testify. At the Court's request, this has been supplemented with a letter from a board-certified family nurse practitioner at Rockland Place, who advises that the complainant has a diagnosis of Advanced Dementia, Neuro-Cognitive Disorder and Generalized Anxiety Disorder. It is the nurse practitioner's view that the complainant's diagnosis, coupled with the fact that she is a fall risk, make her unavailable to appear in Court.

The Court accepts the evidence that the witness is not available to testify in this matter. The question becomes to what extent are her prior statements admissible in evidence against the defendant.

### A. *Crawford* Analysis.

In *Crawford v. Washington*, the U.S. Supreme Court held that statements of unavailable witnesses may not be admitted at trial if the statement was "testimonial" without a prior opportunity for the defendant to cross examine the statement maker.[27] According to the Court, a testimonial statement is one that is given to law

---

[27] 541 U.S. 36, 68-69 (2004).

enforcement for the "primary purpose" of using it in evidence against the accused. So, for example, a lab report of a blood alcohol content prepared by a chemist for a DUI prosecution is testimonial.[28] But statements made by an unavailable 911 caller that identify the perpetrator are not testimonial because the primary purpose is to enable the police to respond to an ongoing emergency.[29]

Just what is meant by "ongoing emergency" was examined in *Michigan v. Bryant*, when a shooting victim left the scene and, describing the past event (of his shooting) he identified his assailant in what amounted to a dying declaration.[30] The Michigan Supreme Court reversed the homicide conviction, reasoning that the trial court had improperly admitted the shooting victim's statement in violation of the Confrontation Clause as interpreted by *Crawford*.[31] But the Supreme Court ruled that Michigan had overread in *Crawford* and that statements relating to a past event are not *per se* testimonial.[32] The Supreme Court said that in determining the primary purpose, the Court must consider the formality or informality of the statement, *i.e.,*

---

[28] *Bullcoming v. New Mexico,* 564 U.S. 647, 665-668 (2011).
[29] *See Dixon v. State*, 996 A.2d 1271, 1279 (Del. 2010); *Davis v. Washington*, 547 U.S. 813, 822 (2006).
[30] *Michigan v. Bryant,* 562 U.S. 344, 349-350 (2011).
[31] *Id.* at 348-49.
[32] *Id.* at 356.

whether it is taken in an interrogation room or out in the public spaces or whether the witness is asked to formally sign a document attesting to its truth.[33]

Complicating matters, while the Court must determine the primary purpose from the objective facts, the subjective purposes of the two conversants: the victim and the police officer, may be divergent. The victim may want the threat to end but may not foresee criminal prosecution as the only possible, or desired, outcome. The police responding to a call may want to allay fears, ensure good order, record matters for report writing, gather and preserve evidence for prosecution and apprehend wrongdoers.

### 1.     The Body Worn Camera Evidence

The statements made by the complainant to the police are not a mystery. They are captured in realistic definition and good audio quality on the body worn camera of a police officer. In the December 17 incident, the complainant is in the kitchen of the next-door neighbor's residence and speaks to the officer directly. She had arrived from her own residence a short time earlier and answered the officer's questions coherently. She explained that she is there because her son is next door and he struck her before she left the residence and went next door.

---

[33] *Id.* at 366.

We can follow the body worn camera as it goes to her residence, knocks repeatedly on the door, finally gains entry through an unlocked door. The police persistently announce their presence and finally encounter her son. There follows an extended conversation with her son, inquiries into the complainant's mental state, whether the defendant had any physical confrontation with her that night and whether she had possibly confabulated the complaint. After much back and forth, the officer leaves the residence without making an arrest.

The Court cannot conclude that the primary purpose of taking the complainant's statements in the neighbor's house was "testimonial" within the meaning of *Crawford*. While the complainant was asked "what happened" as opposed to "what is happening right now," we understand from *Michigan v. Bryant* that this is not the *sine qua non* of our analysis. The complainant is clearly responding to an emergent circumstance, regardless of whether there is a current, ongoing and immediate threat to her. Moreover, the unique circumstances of the complainant's dementia, with its capacity to disorient the speaker at any moment, make it less likely that the police would have in mind that "we should get this recorded right now so we can use it in a later prosecution." Rather, that result appears fortuitous, not one contemplated by either conversant at the time the video was recorded.

The Court does not overlook the preservative effect of the body worn camera and it is fair to point out that, regardless of whether it is recorded for regulatory, administrative, or defensive purposes by the police, it has the effect of preserving the witness' actual words for future use at trial should the witness be unavailable, and the words otherwise qualify under traditional hearsay exceptions. Point noted. But the Confrontation Clause issue, as defined by *Crawford*, is whether the *primary purpose* of the interview and subsequent statements is preservation for use in the prosecution of the defendant. One need look no further than the fact that the Defendant was not arrested and, we presume, would not have been prosecuted, had it not been for the subsequent events weeks later. Perhaps preservation of the statement was "a" purpose of recording the statements of the complainant, but the Court does not find that it was the "primary purpose" and, having so concluded, we need not divine further each of the separate, unrelated reasons why body worn cameras have proliferated in their use in law enforcement.

Under the same analysis, the statements made by the complainant to her next door neighbor during any of her three separate interactions with him, to the EMTs who arrived on the first night, or the medical personnel on the night of December 29 were not made for the "primary purpose" of preservation of those statements for later use by the prosecution and the defense does not seriously argue to the contrary. Thus, these statements, like those made on the body worn camera on the evening of

10

December 29, must be examined under the traditional rules concerning the hearsay statements of an unavailable witness.

### 2. Statements to Hospital Psychologist

Finally, the statements made to the hospital psychologist are not subject to a *Crawford* analysis. The psychologist was interviewing the complainant for the purpose of determining whether she needed psychiatric care while at the hospital. The statements she made were recorded in the notes of the psychiatric consultation, not by or for the police. Because preservation for use at trial was not the primary purpose for recording the notes in the file, they are not subject to exclusion under *Crawford*.

Statements that are not subject to exclusion under *Crawford* are nonetheless subject to the traditional rules against hearsay from an unavailable witness. We turn to those issues next.

### B. Hearsay Exceptions: Excited Utterance

Under the Delaware Rules of Evidence, hearsay is not admissible except as permitted by the rules.[34] The State urges that statements made by the complainant

---

[34] D.R.E. 802.

are admissible despite her unavailability under two exceptions: 1) the excited utterance exception and 2) statements made for medical diagnosis or treatment.[35]

An excited utterance is defined by rule as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."[36] When a statement qualifies as an excited utterance, its admissibility does not depend on the availability of the declarant for cross examination.[37] Thus, an excited utterance may be admitted despite the unavailability of the declarant.

In support of its argument that the complainant's statements were excited utterances, the State cites one case – *Evans v. State*[38] – in support.[39] The defense, in response, cites no cases, opting instead to argue that the statements do not demonstrate any indicia of reliability and therefore should be excluded on the basis of a lack of reliability.[40] Although the defense's failure to directly address the question whether the complainant's statements are excited utterances would alone be grounds to consider the issue waived,[41] the Court will address the State's

---

[35] State's Mot. in Limine, p. 4.
[36] D.R.E. 803(2).
[37] D.R.E. 803.
[38] 2004 WL 1790191 (Del. Aug. 3, 2004) *Evans* is not a case involving a dementia patient or failed memory. Rather, it is a garden variety, excited utterance identifying the shooter case, such as one might find on a routine perusal of excited utterance cases nationwide.
[39] State's Mot. in Limine, p. 5.
[40] Def.'s Response to State's Mot. in Limine, pp. 3-4.
[41] *See Gonzalez v. Caraballo*, 2008 WL 4902686, at *3 (Del. Super. Nov. 12, 2008).

argument anyway, as failing to do so could well result in further disputations over the issue in a different guise. The Court will address Defendant's broader argument presently.

When considering whether a statement qualifies as an excited utterance, courts consider three questions: 1) did an event cause the excitement, 2) was the statement made sufficiently close in time to the event so that the witness did not have time for further reflection, and 3) is the statement related to the startling event?[42]

In *Culp v. State*, the Delaware Supreme Court discussed the excited utterance exception, saying:

> The amount of time that has elapsed between the making of the statement and the startling event is an important, but not dispositive consideration, in determining whether the declarant was in an excited state when the statement was made. Therefore, the analysis must focus on the condition of the declarant at the time the statement was made. When conducting this analysis, a court must carefully consider all the factors present.[43]

And what, one might ask, are "all the factors present" that must be considered? The Supreme Court noted that these include "the nature of the startling event, whether the statement was made in response to questioning, *the nature of the declarant*, and whether the statement is self-serving."[44]

---

[42] *Gannon v. State,* 704 A.2d 272, 274 (Del. 1998).
[43] 766 A.2d 486, 490 (Del. 2001).
[44] *Culp*, 766 A.2d 486, 491 n.7.

Well, we know that the startling event on December 28 was an alleged assault on an elderly woman, committed by her son. For anyone, that is a startling event. The statements to the officer were in response to questions, but those questions were prompted by spontaneous statements by the declarant to her next door neighbor. And the statement is decidedly *not* self-serving.

## 1. *The Nature of the Declarant*

The most salient issue for our analysis is the nature of the declarant. One of the reasons the excited utterance has been an exception to the rule against hearsay historically has been the supposition that statements uttered while under the excitement of a traumatic event are more likely to be true. The defense does not argue that the declarant was not laboring under the "excitement" of an assault by her son. Has she had sufficient time for reflection so as to fabricate facts to report to the police? No, she has not. She came to the neighbor's house on a winter night and spontaneously reported the assault.

The jury will inevitably learn that the complainant is a dementia patient and was showing symptoms of dementia at the time of her reports. But does her condition render her too unreliable a reporter of her condition to permit her excited utterance to be admitted? We have no Delaware precedent dealing with dementia patients, but it is not without precedent elsewhere.

In *People v. Moore*, the Court of Appeals of Michigan affirmed a trial judge's decision to allow a dementia patient's statements to her daughter that she had been raped by the defendant despite its utterance some 10 hours after the event.[45] The trial court admitted the statement under the excited utterance exception, "reasoning that as a result of [victim's] dementia the conversation with [her daughter] may have seemed to [victim] to occur immediately after the assault and that despite the lapse of several hours after the assault, [victim] apparently was still very agitated when she spoke to [her daughter] on the phone."[46] That decision was affirmed by the Michigan Court of Appeals.[47] And in addition to being affirmed, it makes sense: the declarant's dementia distorts her sense of time and immediacy. This distortion of the declarant's sense of time relaxes the contemporaneity restrictions normally imposed on an excited utterance analysis.

This same analysis holds true to make admissible the complainant's statements to her next door neighbor on December 17 and December 29 and January 17. These were substantially closer in time to the event than those made to the body worn camera, but they were described by the complainant as having just recently occurred, prompting her to leave her house and walk to her neighbors for assistance.

---

[45] 2022 WL 17365038, at *1 (Dec. 1, 2022).
[46] *Id.* at *3
[47] *Id.* at *5.

15

## C. Statements to Psychologist.

The other category of statements subject to a possible hearsay objection is statements made by the complainant to a psychologist at the hospital after being admitted for trauma. These are detailed above and generally reference the fact that she has been abused by her son in the past. As the Court understands it, the complainant made these statements to a psychologist who was assigned to her by the hospital to assess her mental health and well-being and to diagnose whether further psychological/psychiatric treatment was needed.

Under Rule 803(4), statements made for medical diagnosis or treatment are admissible over a hearsay objection provided that are 1) "reasonably pertinent to -- medical diagnosis or treatment; and" 2) "describes medical history, past or present symptoms or sensations; their inception; or their general cause."[48] Like an excited utterance, these statements are admissible regardless of the unavailability of the declarant.[49]

In *Capano v. State*, the Supreme Court ruled that statements to a psychotherapist should be held to "the general acceptance of statements made to doctors or medical paraprofessionals for physical ailments."[50] The complainant's

---

[48] D.R.E. 803(4).
[49] D.R.E. 803.
[50] 781 A.2d 556, 625 (Del. 2001) (citations omitted).

16

statements here were made for the purposes of diagnosing and treating her mental condition while in the hospital and are admissible over a hearsay objection. Having so ruled, the Defendant may parse the statements further as needed to move for exclusion of some of the statements on grounds they are not for diagnostic or treatment purposes. The Court will hear further from the parties as needed. But as a general matter, such statements are admissible.

## D. Defense Complaints Concerning Overall Reliability

The Court returns then to the issue raised by the defense in its response to the motion. Defendant does not so much argue that the statements fit or do not fit within any particular hearsay rubric. Rather, the gist is that the complainant was suffering from dementia even at the time of the incidents giving rise to the charges in this indictment.[51] Her statements are therefore almost inherently unreliable and put the Defendant in the untenable position of having to try to impeach his mother's confabulations and fantasy statements.[52]

The Court understands that Defendant's arguments concerning the witness' reliability as a reporter are the heart of the defense. The jury will understand that she suffers from dementia and the jury may well determine that her story is just that – a

---

[51] Def.'s Response to State's Mot. in Limine, pp. 4-5.
[52] *Id.* at 5.

story. But Defendant's argument that all of her statements must be ruled inadmissible, and the case dismissed because she suffers from dementia asks too much. Dementia sufferers are not all liars about all things: they suffer from memory issues but are just as capable of being victimized as anyone else. The mere presence of dementia cannot be held as incapacitating as Defendant urges. Rather, it is entirely appropriate that the jury be apprised of the complainant's condition, of her allegations, and of the possibility that her statements are not true, just as would be the case in any jury trial. It will be for the jury to determine whether her statements are accurate and whether the Defendant is guilty.

**IT IS SO ORDERED**.

/s/ Charles E. Butler
Charles. E. Butler, Resident Judge